## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | CASE NO. 12-MD-02311 HON. MARIANNE O. BATTANI |
| In Re: WINDSHIELD WASHER SYSTEMS CASES | |
| THIS RELATES TO:  DIRECT PURCHASER ACTIONS | 2:13-cv-02801-MOB-MKM |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Tiffin Motor Homes, Inc., and SLTNTRST LLC, Trustee for Fleetwood Liquidating Trust, individually and on behalf of the proposed class of direct purchasers of Windshield Washers Systems and components thereof (as defined below), bring this action against Defendants for damages under the antitrust laws of the United States.

## SUMMARY OF THE CASE

1.   Defendants are manufacturers of Windshield Washer Systems and components thereof ("Windshield Washers") for installation in motor vehicles manufactured or sold in the United States.  Plaintiffs allege that Defendants conspired to rig bids, and to fix, maintain, and/or stabilize the prices of Windshield Washers sold in the United States from at least January 1, 2000 through the present.  Plaintiffs further allege that Defendants fraudulently concealed their conspiracy.

2.   On September 26, 2013, the United States Department of Justice ("DOJ") announced that Mitsuba Corporation agreed to plead guilty and pay a $135 million criminal fine for its role

- 1 -

in a conspiracy to fix prices of Windshield Washers installed in automobiles sold in the United States and elsewhere.

3.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and direct purchasers who, during the Class Period, purchased Windshield Washers in the United States from one or more of the Defendants or their co-conspirators.  This action is brought under Section 1 of the Sherman Act to recover damages suffered by Plaintiffs and the Class and to enjoin Defendants from continuing or reviving the anticompetitive conduct.

4.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the proposed Class paid higher prices for Windshield Washers than they would have paid in a competitive market.

## JURISDICTION AND VENUE

5.     Plaintiffs bring this action to recover damages, including treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violation of the Sherman Act, 15 U.S.C. § 1.

6.     The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, affected interstate trade and commerce (discussed below) has been carried out in this District, and because one or more of the Defendants reside in this District.

7.    By virtue of their nationwide contacts and activities, Defendants are subject to the jurisdiction of this Court.   Alternatively, there is jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

## DEFINITIONS

8.    The term "Class Period" refers to the time period from at least as early as January 1, 2000 through the present.

9.    The term "Windshield Washers" include components such as the pump, hoses, nozzle and tank necessary to deliver washer fluid to vehicle windows.

10.    The term "Defendant" refers to a named Defendant and all of the named Defendant's predecessors, including Windshield Washers manufacturers merged with or acquired by the named Defendant and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that sold Windshield Washers directly to purchasers in the United States or to purchasers for use in the United States during the Class Period. The term "Defendants" refers to the named Defendants and all of the named Defendants' predecessors, including Windshield Washers manufacturers merged with or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold Windshield Washers directly to purchasers in the United States or to purchasers for use in the United States during the Class Period.

11.    References made herein to any corporation include any predecessors, successors, parents, subsidiaries, affiliates and divisions of that corporation.

## TRADE AND COMMERCE

12.    During the Class Period, each Defendant sold Windshield Washers in or into the United States in a continuous and uninterrupted flow of interstate commerce.

13.  The business activities of the Defendants substantially affected interstate trade and commerce in the United States.

## PARTIES

14.  Plaintiff Tiffin Motor Homes, Inc., is an Alabama corporation with its principal place of business located in Red Bay, Alabama.  Tiffin Motor Homes, Inc. purchased Windshield Washers directly from one or more Defendants and/or their co-conspirators during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

15.  Plaintiff SLTNTRST LLC is the duly authorized and empowered Trustee for Fleetwood Liquidating Trust.  Fleetwood Liquidating Trust was formed pursuant to the Joint Plan of Liquidation of Fleetwood Enterprises, Inc. and Its Affiliated Debtor and the Official Committee Creditors Holding Unsecured Claims.  The Joint Plan of Liquidation was confirmed by the United States Bankruptcy Court for the Central District of California (Riverside) pursuant to 11 U.S.C. § 1129.  Fleetwood Enterprises, Inc. filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code on March 10, 2009.  Fleetwood Enterprises, Inc., headquartered in California, was a leading producer of recreational vehicles, motor homes, and travel trailers in the United States.  Fleetwood Enterprises, Inc. purchased Windshield Washers directly from one or more Defendants and/or their co-conspirators during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

16.  Defendant Denso Corporation is a Japanese corporation with its principal place of business in Kariya, Japan.  Denso Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Windshield Washers that were purchased throughout the United States, including in this District, during the Class Period.

17.    Defendant ASMO Co., Ltd. is a Japanese corporation with its principal place of business in Shizuoka, Japan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Denso Corporation.  ASMO Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Windshield Washers that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

18.    Defendant Denso International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Denso Corporation.  Denso International America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Windshield Washers that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent. According to Denso Corporation's website, Denso International America, Inc. is "Denso's North American regional headquarters and parent company for its North American operations, original equipment (OE) sales, product engineering and technical support to OE sales and finance."

19.    Defendant ASMO North America, LLC is a Delaware corporation with its principal place of business in Statesville, North Carolina.  It is a subsidiary of and wholly owned and/or controlled by its parent, Denso Corporation. ASMO North America, LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Windshield Washers that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the

United States were under the control and direction of its Japanese parent. According to Denso Corporation's website, ASMO North America, LLC is the "[r]egional headquarters for ASMO affiliates in North America" and "coordinates the business activities of all affiliates in North America."

20. Defendant ASMO Manufacturing, Inc. is a Michigan corporation with its principal place of business in Battle Creek, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Denso Corporation. ASMO Manufacturing, Inc. manufactured, marketed, and/or sold Windshield Washers that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

21. Defendants Denso Corporation, ASMO Co., Ltd., Denso International America, Inc., ASMO North America, LLC, and ASMO Manufacturing, Inc., are referred to collectively herein as "Denso."

22. Defendant Mitsuba Corporation is a Japanese corporation with its principal place of business in Gunma, Japan. Mitsuba Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Windshield Washers that were purchased throughout the United States, including in this District, during the Class Period.

23. Defendant American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsuba Corporation. American Mitsuba Corporation manufactured, marketed and/or sold Windshield Washers that were purchased throughout the United States, including in this

District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

24.  Defendants Mitsuba Corporation and American Mitsuba Corporation are referred to collectively as "Mitsuba."

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

25.  Various persons or firms not named as Defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

26.  Each Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

27.  Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).  The Class is defined as follows:

> All individuals and entities who purchased Windshield Washers in the United States directly from one or more of the Defendants and/or their co-conspirators (or their controlled subsidiaries, affiliates, or joint ventures) from at least as early as January 1, 2000 through the present.

28.  Plaintiffs do not know the exact number of Class members as such information is exclusively controlled by Defendants.  Because of the trade and commerce involved, however, Plaintiffs believe that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

29.   There are questions of law or fact common to the class, including but not limited to the following:

      a.    Whether Defendants engaged in a contract, combination, or conspiracy to rig bids and to fix, raise, maintain, and/or stabilize prices of Windshield Washers sold in the United States;

      b.    Whether Defendants' conduct caused the prices of Windshield Washers sold in the United States to be sold at artificially high levels;

      c.    Whether Defendants undertook actions to conceal their unlawful conspiracy; and

      d.    Whether Plaintiffs and other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members.

30.   These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

31.   Plaintiffs' claims are typical of the claims of the Class because Plaintiffs directly purchased Windshield Washers from one or more of the Defendants, Plaintiffs and all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiffs is common to the Class.

32.   Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of Windshield Washers and have no conflict with any other members of the Class.   Further, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

33. A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

34. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

35. The Class is also readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## FACTUAL ALLEGATIONS

### Windshield Washers

36. Windshield Washers are systems that help maintain the cleanliness of a motor vehicle's windshields. When a driver activates the windshield washer assembly, a pump provides pressure to enable washer fluid to flow through a nozzle and out onto the exterior of an automobile's windshield.

37. Windshield Washers include components such as the pump, hoses, nozzle and tank necessary to deliver washer fluid to vehicle windows.

38. As part of the manufacturing process, original equipment manufacturers ("OEMs") install Windshield Washers into new vehicles. They are also installed in motor vehicles to replace worn out, defective or damaged Windshield Washers.

39. Windshield Washers are purchased directly from Defendants by motor vehicle manufacturers and component manufacturers who then supply Windshield Washers as part of a system to OEMs. These component manufacturers are also called "Tier 1" or "Tier 2" manufacturers in the industry.

40. When purchasing Windshield Washers, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years. Typically, the bidding process begins approximately three years prior to the start of production of a new model. Japanese OEMs procure parts for U.S.-manufactured vehicles both in Japan and the United States.

41. Defendants and their co-conspirators supplied Windshield Washers to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Windshield Washers (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

42. Plaintiffs and members of the proposed Class have purchased Windshield Washers directly from one or more of the Defendants.

**The Windshield Washers Market is Conducive to Collusion**

43. In addition to the agreements to plead guilty, several important economic characteristics of the market for Windshield Washers plausibly increased its conduciveness to a price-fixing conspiracy.

44. One such important, economic characteristic of a market conducive to conspiratorial behavior is high barriers to entry. There are substantial barriers to entry in the market for Windshield Washers because of significant start-up capital expenditures. A new entrant into the

business would have to incur millions of dollars in costs, including large investments in plant and machinery, research and development, infrastructure for distribution, transportation, and labor.

45.   Another factor contributing to barriers to entry is the common use of contracts between suppliers and large-volume purchasers of Windshield Washers.  A new entrant would face a significant hurdle to break into the market in the face of existing contracts with incumbent suppliers.

46.   Additionally, the market for Windshield Washers is highly concentrated.  Upon information and belief, Defendants and their co-conspirators control a majority of the market for the manufacture and sale of Windshield Washers for use in motor vehicles manufactured and/or sold in or into the United States.

47.   Inelastic demand is another important characteristic.  When a seller of goods or services can increase prices without suffering a substantial reduction in sales, demand is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, demand must be relativity inelastic.  Otherwise, increased prices would result in declining use of the product and a corresponding reduction in revenues and profits.

48.   Demand for Windshield Washers is highly inelastic.  Motor vehicle manufacturers must use Windshield Washers because there are no viable substitute products.

49.   Defendants also attended pre-bid meetings sponsored by OEMs to disseminate information regarding RFQs, bid specifications, as well as design and engineering features and communicated with each other regarding these issues.  These meetings and communications not only introduced Defendants' representatives to each other, but also facilitated Defendants' collusive conduct.

## DEFENDANTS' ANTITRUST CONSPIRACY

50. During the Class Period, Defendants and their co-conspirators, the dominant producers of Windshield Washers, conspired to (a) rig bids for and allocate the supply of Windshield Washers and (b) raise, fix, and maintain prices for Windshield Washers sold in or into the United States.

51. Defendants engaged in numerous acts in furtherance of the alleged conspiracy, as described below.

52. Defendants participated in meetings, conversations, and communications to discuss bids and price quotations for Windshield Washers sold in or into the United States.

53. Defendants agreed during those meetings, conversations, and communications to rig bids and allocate the supply of Windshield Washers sold in or into the United States.

54. Defendants submitted bids and price quotations to motor vehicle manufacturers in accordance with their conspiratorial agreements.

55. Defendants knew and intended that their pricing actions regarding their sales of Windshield Washers to motor vehicle manufacturers would have a direct impact on prices for Windshield Washers sold to all direct purchasers throughout the United States.

56. Defendants engaged in a single price-fixing conspiracy involving Windshield Washers that impacted not only multiple bids submitted to OEMs, but also the prices paid to Defendants and their co-conspirators by all other direct purchasers of Windshield Washers. Defendants' scheme was implemented, it succeeded, and it affected the prices for all Windshield Washers.

57. Defendants accomplished their conspiracy, in part, by rigging bids they made in response to RFQs. OEMs issue RFQs to motor vehicle parts suppliers to obtain prices for parts, including Windshield Washers.

58. OEMs use RFQs to procure parts for U.S.-manufactured motor vehicles in the United States and abroad.

59. Typically, OEMs issue RFQs for motor vehicle parts, such as Windshield Washers, approximately three years before the OEM begins vehicle production.

60. The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (a) the OEM issues the RFQ to multiple parts suppliers, (b) the suppliers submit bids, (c) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing, (d) the suppliers submit revised bids, and (e) the OEM selects the winner.

61. Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

62. When an OEM purchases Windshield Washers directly from the supplier to whom it awarded the contract, the OEM purchases the Windshield Washers at the winning price.

63. That winning price is also used when suppliers that were not part of the RFQ process purchase Windshield Washers directly from the winning Windshield Washers bidder for incorporation into products manufactured and sold to vehicle manufacturers. Those suppliers, who directly purchase Windshield Washers from the winning bidder, pay the winning bidder at least the winning price.

64. It was important to the success of the cartel alleged herein that its members control and manipulate the prices paid by OEMs in order to control the prices paid by all other direct purchasers of Windshield Washers.

65. OEMs and other direct purchasers of Windshield Washers paid supracompetitive prices as a result of Defendants' conspiracy because the price-fixed bid of the winning bidder established the floor at which all Windshield Washers were sold to direct purchasers.

**Government Investigation and Guilty Pleas**

66. Various U.S. and international governmental authorities, including the U.S. DOJ via its Antitrust Division, are currently investigating anticompetitive conduct in connection with the production and sale of Windshield Washers and other automotive parts. The Japan Fair Trade Commission ("JFTC") launched an investigation in 2011 over suspected cartel activity among auto parts suppliers.

67. In July 2011, the JFTC raided the offices of Defendants Denso and Mitsuba amid suspicions that the companies violated Japan's anti-monopoly law in relation to their sales of Windshield Washers.

68. In a July 20, 2011 press release, Denso confirmed that the JFTC investigated the company's headquarters in Kariya, Aichi and other sales branches in Japan "regarding sales of certain automotive components."

69. On July 20, 2011, *The Wall Street Journal* reported that Mitsuba was raided by the JFTC as part of the spreading investigation into suspected price-fixing of automotive parts.

70. As a result of these raids and investigations, on November 22, 2012, the JFTC issued cease and desist orders and surcharge payment orders to Defendant Mitsuba for its involvement in a price-fixing conspiracy in connection with the sale of windshield wiper systems and starters

in violation of Article 3 of Japan's Antimonopoly Act.  The JFTC fined Mitsuba 1.1 billion yen (USD $13.5 million).

71.  Defendant Denso admitted to its participation in the price-fixing of several automotive parts, but received immunity from fines because it provided information to the JFTC that led to the investigation.  Japan's leniency program grants full immunity from prosecution to the applicant if it admits its participation in the cartel and provides the JFTC with the relevant information detailing the anticompetitive violation.  Because of its admission and cooperation, Denso was not prosecuted criminally by the JFTC.

72.  On September 26, 2013, the DOJ charged Defendant Mitsuba with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and to fix, stabilize, and maintain the price" of Windshield Washers (as well as other motor vehicle parts) in violation of the Sherman Act.

73.  According to the criminal Information filed, Defendant Mitsuba and its co-conspirators carried out the Windshield Washers conspiracy by:

> a.    participating in meetings, conversations, and communications in the United States to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;
>
> b.    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

c.    agreeing, during those meetings, conversations, and communications, to allocate the supply of Windshield Washers sold to automobile manufacturers in the United States and elsewhere;

d.    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e.    submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f.    selling Windshield Washers to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g.    accepting payment for Windshield Washers sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

h.    engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

i.    employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

74. Additionally, the DOJ charged Defendant Mitsuba with obstruction of justice after executives of Mitsuba, acting on the company's behalf, directed employees "to locate, conceal and destroy documents and electronic files that were likely to contain evidence of antitrust crimes in the United States and elsewhere" in violation of 18 U.S.C. § 1519.

75. On September 26, 2013, the DOJ announced that Defendant Mitsuba had agreed to pay a $135 million criminal fine and plead guilty to a two-count criminal Information charging Mitsuba with engaging in a conspiracy to allocate the supply of, to rig bids for, and to fix, stabilize and maintain the prices of Windshield Washers sold in the United States and elsewhere from January 2000 until at least February 2010. On November 6, 2013, Mitsuba pleaded guilty to these charges.

76. Furthermore, according to Mitsuba's plea agreement, after learning that the Federal Bureau of Investigation executed a search warrant on the offices of a co-conspirator, at least three senior executives (Executives "A," "B," and "C") from Mitsuba and its U.S. subsidiary, American Mitsuba Corporation, directed subordinates and other employees to conceal and destroy documents and electronic files in their possession, custody or control. Executives "A" and "B" were also members of Mitsuba's board of directors.

77. In a September 26, 2013 press release, U.S. Attorney General Eric Holder stated that "[t]he Department of Justice will continue to crack down on cartel behavior that causes American businesses and consumers to pay higher prices for the products and services they rely upon in their everyday lives."

78. Defendant Mitsuba carried out its illegal scheme along with Denso and other unnamed co-conspirators.

## PLAINTIFFS' CLAIMS ARE TIMELY

79. Plaintiffs incorporate by reference the allegations set forth above and adopt same as though fully set forth herein.

80. Plaintiffs and the members of the Class had no knowledge of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth

herein, until at least September 26, 2013, the date that the DOJ publicly announced the guilty plea of Defendant Mitsuba, at the earliest.  As a result, Plaintiffs and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until, at the earliest, September 26, 2013.

81.  No information in the public domain was available to Plaintiffs and the members of the Class prior to September 26, 2013, when the DOJ publicly announced the guilty plea of Defendant Mitsuba.  Prior to that time, there was insufficient information to suggest that any one of the Defendants was involved in a conspiracy to price-fix and rig bids for Windshield Washers. For these reasons, the statute of limitations as to claims alleged herein did not begin to run until, at the earliest, September 26, 2013.

82. Further, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Class until at least September 26, 2013.  Defendants affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiffs and the Class, from at least as early as January 2000.  During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to the instant Complaint.

83.  Before at least September 26, 2013, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct, and did not know before then that they were paying supra-competitive prices for Windshield Washers purchased from Defendants and their conspirators during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and the members of the Class that would have suggested to Plaintiffs and the members of the Class that they were being injured by Defendants' unlawful conduct.

84. The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

85. By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing. Windshield Washers are not exempt from antitrust regulation and, thus, Plaintiffs and the members of the Class reasonably considered it to be a competitive industry. For example, the DOJ press release states that the Defendants "took measures to keep their conduct secret by using code names and meeting in remote locations." Furthermore, Mitsuba took additional steps to destroy evidence as its misconduct was being discovered.

86. During these meetings, conversations, and communications, Defendants and their co-conspirators agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

87. Defendants likewise agreed to allocate the supply of Windshield Washers sold to customers in the United States and elsewhere.

88. Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

89. In accordance with the agreements reached by Defendants, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

90. Plaintiffs and the members of the Class could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

91.  Plaintiffs received various pricing information from one or more of the Defendants or their co-conspirators.  Plaintiffs had no way to know that these prices were higher than they should have been due to the conspiracy alleged herein.

92.  For these reasons, the statute of limitations applicable to Plaintiffs' and the Class's claims was tolled and did not begin to run until at least September 26, 2013.

## ANTITRUST INJURY

93.  Defendants' conspiracy caused injury to Plaintiffs and members of the Class by suppressing price competition among Defendants, thereby depriving all direct purchasers of Windshield Washers of the benefits of a competitive market and setting prices of Windshield Washers at artificially high levels.

94.  As a direct result of Defendants' conspiracy, Plaintiffs and members of the Class have been injured in their business or property in that they paid more for Windshield Washers than they would have in a competitive market.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 –Against All Defendants)

95.  Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

96. During the Class Period, Defendants and their co-conspirators engaged in a continuing agreement, combination, or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Windshield Washers sold in or into the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

97. The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

98. The contract, combination or conspiracy resulted in a continuing agreement, understanding, or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, or stabilized prices for Windshield Washers sold in or into the United States. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws.

99. Defendants succeeded in rigging bids and fixing, raising, maintaining, and stabilizing the prices of Windshield Washers sold by them in or into the United States during the Class Period.

100. For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.    Participating in meetings and conversations in the United States and Japan to discuss the bids and quotes of Windshield Washers to be submitted to direct purchasers in the United States;

    b.    Agreeing on bids and price quotations to be submitted to direct purchasers in the United States;

    c.    Agreeing to manipulate prices and allocate supply of Windshield Washers sold in or into the United States in a manner that deprived direct purchasers of free and open competition;

    d.    Agreeing to coordinate price adjustments in the United States;

- 21 -

e. Submitting bids, price quotations, and price adjustments to direct purchasers of Windshield Washers in accordance with the agreements reached;

f. Selling Windshield Washers to direct purchasers in the United States at supracompetitive prices; and

g. Employing measures to conceal the true nature of their unlawful conduct from Plaintiffs and other members of the Class in furtherance of the conspiracy.

101. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for Windshield Washers purchased from Defendants and their co-conspirators than they otherwise would have paid in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, and respectfully request the following relief:

A. That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B. That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C. That Plaintiffs and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs

- 22 -

and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.     That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.     That Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.     That Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  June 20, 2014                              Respectfully submitted,

By: /s/David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Road: Ste. 111
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

Interim Liaison Counsel for
Direct Purchaser Plaintiffs

- 23 -

Gregory P. Hansel
Randall B. Weill
Jonathan G. Mermin
Michael S. Smith
**PRETI FLAHERTY, BELIVEAU**
**& PACHIOS LLP**
One City Center, P.O. Box 9546
Portland, ME 04112
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
jmermin@preti.com
msmith@preti.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
Michael L. Silverman
**FREED KANNER LONDON**
**& MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com
msilverman@fklmlaw.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
**KOHN SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
**SPECTOR ROSEMAN KODROFF**
**& WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Interim Lead Counsel for Direct Purchaser Plaintiffs

| | |
|---|---|
| Melissa H. Maxman<br>Ronald F. Wick<br>Catherine R. Reilly<br>COZEN O'CONNOR<br>The Army and Navy Building<br>1627 I Street, NW<br>Suite 1100<br>Washington, D.C. 20006<br>(202) 912-4800 | Lee Albert<br>GLANCY BINKOW & GOLDBERG LLP<br>122 East 42nd Street, Suite 2920<br>New York, NY 10168<br>(212) 682-5340<br><br>Solomon B. Cera<br>Thomas C. Bright<br>GOLD BENNETT CERA & SIDENER LLP<br>595 Market Street, Suite 2300<br>San Francisco, CA 94105-2835<br>(415) 777-2230 |

M. John Dominguez
COHEN MILSTEIN SELLERS
& TOLL PLLC
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
(561) 833-6575

Matthew W. Ruan
COHEN MILSTEIN SELLERS & TOLL
PLLC
88 Pine Street, 14th Floor
New York, NY 10006
(212) 220-2913

Ruthanne Gordon
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
Irwin B. Levin
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481

W. Joseph Bruckner
LOCKRIDGE GRINDAL
NAUEN P.L.L.P.
100 Washington Avenue South
Minneapolis, MN 55401
(612) 339-6900

Lewis Goldfarb
MCELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
(973) 425-8689

Marvin A. Miller
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
(312) 332-3400

Jeffrey S. Goldenberg
GOLDENBERG SCHNEIDER, LPA
35 East Seventh Street, Suite 600
Cincinnati, OH 45202
(513) 345-8291

Linda P. Nussbaum
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
(612) 338-4605
Robert N. Kaplan
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980

Steven D. Irwin
LEECH TISHMAN FUSCALDO
& LAMPL, LLC
525 William Penn Place, 30th Floor
Pittsburgh, PA 15219
(412) 261-1600

Steve Greenfogel
LITE DEPALMA GREENBERG, LLC
1521 Locust Street
Philadelphia, PA 19102
(215) 564-5182

Garret Blanchfield
REINHARDT, WENDORF
& BLANCHFIELD
E-1250 First National Bank Bldg.
332 Minnesota St.
St. Paul, MN 55101
(651) 287-2100

| | |
|---|---|
| Jayne A. Goldstein<br>POMERANTZ GROSSMAN HUFFORD<br>DAHLSTROM & GROSS LLP<br>1792 Bell Tower Lane, Suite 203<br>Weston, FL 33326<br>(954) 315-3454<br><br>Jason J. Thompson<br>SOMMERS SCHWARTZ PC<br>2000 Town Center, Suite 900<br>Southfield, MI 48075<br>(248) 355-0300 | R. Alexander Saveri<br>SAVERI & SAVERI, INC.<br>706 Sansome Street<br>San Francisco, CA 94111<br>(415) 217-6810<br><br>Daniel J. Mogin<br>THE MOGIN LAW FIRM, P.C.<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br>(619) 687-6611 |

Additional Counsel